UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF NORTH CAROLINA
WESTERN DIVISION

No. 5:13-CV-754-F

| | | |
|---|---|---|
| MARY ROWE, | ) | |
| Plaintiff, | ) | |
| | ) | |
| vs. | ) | O R D E R |
| | ) | |
| GOLDSBORO WAYNE TRANSPORTATION | ) | |
| AUTHORITY, | ) | |
| Defendant. | ) | |

This matter is before the court on Defendant Goldsboro Wayne Transportation Authority's Motion for Summary Judgment [DE-37], as well as its Motion to Strike Plaintiff's Affidavit of Adrienne Deloach Hubbard [DE-46] and Defendant's Motion to Strike Plaintiff's Response to Defendant's Summary Judgment and Plaintiff's Responses to Exhibits [DE-48]. For the reasons more fully stated below, the Motion for Summary Judgment is ALLOWED, and the Motions to Strike are DENIED.

## I. PROCEDURAL BACKGROUND

The pro se Plaintiff Mary Rowe initiated this action by filing motion for leave to proceed in forma pauperis [DE-1] on October 28, 2013. Her motion was allowed on November 1, 2013 [DE-3] and her Complaint [DE-1] was filed. In the Complaint, Rowe alleged: "I lost my job because I was trying to help a young lady that said she was being sexual [sic] harass [sic] by the director. I called the Chairman to report him and told the young lady that I would pray for her and get others to also pray." Compl. [DE-1] at 3. She alleged that the acts complained of in the action concerned "Wrongful Termination," "Retaliation," and "Discrimination." Rowe included attachments to the Complaint, including a Determination from the Equal Employment Opportunity Commission

("EEOC") finding, in part, that the evidence supported Rowe's claim that she was discharged in retaliation for complaining of sexual harassment in violation of Title VII [DE-4-2].

On January 20, 2014 Defendant Goldsboro Wayne Transportation Authority ("Gateway") [DE-37] moved for summary judgment on Rowe's claims. The Clerk of Court issued a Notice to Rowe on January 21, 2015 [DE-39] notifying her of, *inter alia*, the response deadline of February 13, 2015. The day of the response deadline, Rowe filed 331 pages of documents [DE-43], mainly consisting of the exhibits Gateway attached to the Complaint and her interpretation and arguments as to each exhibit. That same day, the Clerk of Court advised Rowe that she seemingly only had filed exhibits, and had failed to provide a response with a case caption, case number, and the title of the document on it. A week later, on February 20, 2015, the Clerk issued a Notice of Deficiency to Rowe.

On February 23, 2015, Rowe filed a document entitled Response to the Defendant's Summary Judgment [DE-44], which more closely resembles a traditional memorandum of law in response to a motion for summary judgment. The next day, Rowe filed a notarized letter from Adrienne Deloatch Hubbard [DE-45].[1] On February 25, 2015, the Clerk of Court issued another Notice of Deficiency to Rowe, instructing Rowe to "provide to the Clerk's Office a captioned document titled Certificate of Service that indicates service of the response was made on Defendant" and directing her to refer to Federal Rule of Civil Procedure 5(d)(1)."

Gateway then filed its Motion to Strike the Deloatch letter, Motion to Strike Rowe's February

---

[1] In the letter, Ms. Deloatch Hubbard states "If possible, I request that my name be kept anonymous." The Clerk of Court placed this letter under temporary seal. No motion to seal, however, has been filed. The court cannot discern any basis, under the precedent set forth by the Fourth Circuit, for continuing to maintain this letter under seal. Accordingly, the Clerk of Court is DIRECTED to unseal the letter.

23, 2015 Response, and its Reply in support of its motion for summary judgment. All these motions are now ripe for ruling.

## II.  STATEMENT OF THE FACTS

The facts, in the light most favorable to Rowe, are as follows.[2]  Although it is not explicitly spelled out in any of the evidentiary materials, Defendant Goldsboro Wayne Transportation Authority ("Gateway") appears to be an agency affiliated with Wayne County and the City of Goldsboro that provides transportation services to citizens and clients of various agencies.  Rowe, an African-American, Christian female, was hired by Gateway as a driver on November 5, 2007. Dep. of Mary Rowe [DE-40-2] at 20.  She held this position at Gateway from the time of her hire until 2010.

As a driver, Rowe was responsible for transporting clients of Gateway from their homes to other locations for work, medical appointments, and other engagements.  The record does not contain all of Rowe's performance reviews as a driver; however, it does contain a 2009 evaluation and other evidence documenting some issues with her performance.  On September 2, 2008, a customer made a complaint stating that Rowe "was not friendly and talked very rudely to passengers."  Aff. of Guy, Ex. I [DE-41-1] at 41. The customer also reported that Rowe said "no" when he asked her to turn off the air conditioning in the vehicle. *Id.*  On the Customer Complaint Incident Report documenting the complaint, Rowe responded that when the customer asked to turn down the air conditioning, she turned it down as low as it could go, and when he yelled at her to turn it off, she told him no. *Id.*  The record does not indicate that any disciplinary action was taken against Rowe on the basis of this

---

[2]  The court has considered Gateway's Motions to Strike [DE-46; DE-48] under the applicable standards, and they are DENIED.

customer in complaint.

On March 5, 2009, Rowe was suspended for three days without pay due to her failure to show up for work after she was denied time off. *See* Aff. of Guy, Ex. J [DE-41-1] at 43. Rowe testified that she believed her direct supervisor, Yokeisha Wright, suspended her out of meanness. Dep. of Rowe [DE-40-2] at 24. She also received two written warnings in 2009 for not following instructions. *See* Aff. of Guy, Exs. K & L, [DE-41-1] at 44-47. Rowe also received a June 29, 2009, evaluation noting that she failed to load wheelchairs onto a vehicle directly. *See* Aff. of Guy, Ex. M [DE-41-1] at 49-50. The evaluation form also indicated, however, numerous items that Rowe was performing correctly. *Id.* Finally, on August 2, 2010, her supervisor attempted to suspend her for not attending a meeting. Rowe spoke to the then-director of Gateway, Alan Stubbs, who told her what to do to get the suspension dropped. Dep. of Mary Rowe [DE-40-2] at 25-27.

On August 9, 2010, Gateway transferred Rowe from her position as a driver to billing clerk, where her job responsibilities included receiving the bus drivers' logs and converting those into bills sent to the agencies who hired Gateway. Dep. of Mary Rowe [DE-40-2] at 29-30, 76-78, 84-85. Invoices were based on the length of the trip, whether the client was a no-show, or whether the client had canceled. *Id.* at 77-78. Rowe experienced some difficulties in her new position.

Rowe contends that the former billing clerk refused to train her because she wanted her job back. *Id.* at 33. She also contends that after she served as billing clerk, she discovered "a lot of stuff" in her personnel file that she had never been shown before, such as reports from the Operations Manager Michael Branch and Director Stubbs. *Id.* at 34. She also claims that Director Stubbs favored another employee, Eva Pest, over her and treated Rowe unfairly by making her work overtime, making her work during inclement weather, and blaming other employees' deficiencies

4

on her. *Id.* at 32-36. Rowe also claims that Manager Branch, an African American male, told some employees that he was going to get rid of her and that she was not qualified to do the job. *Id.* at 36-37. According to Rowe, Branch also did "everything to sabotage" her job performance, by requiring her to do other employee's job duties, like performing dispatch or driving on the road. *Id.* at 78.

In addition to Operations Manager Branch, Rowe contends other Gateway employees—and even people outside the organization—wanted her gone. For example, she contends that an employee of Wayne County Department of Social Services, Bonnie Clerk, wanted her fired because she wanted another employee, Jeri Teachey, to be placed back in the position as billing clerk. *Id.* at 67, 93. Rowe also claims that two other Gateway employees—Reservationist Angela Waddell and Administrative Assistant Eva Pest—were actively working with Operations Manager Branch to "build a folder" to get her terminated. *Id.* at 47. According to Rowe, Operations Manager Branch wanted her terminated because she was a close colleague of Jeri Teachey, whom he did not like; Waddell wanted her terminated because Rowe was highlighting Waddell's own poor performance; and Pest wanted her terminated because Pest was close to Waddell. *Id.* at 48-51.

Rowe eventually spoke with Clark's superior at DSS about her concern with Clark's objections to Rowe's job performance. *Id.* at 46-47. According to Rowe, Operations Manager Branch did not like that Rowe spoke to someone outside Gateway because he and others "were just trying to build a folder to [her] terminated," and by speaking with others, it "irritated their plot and plan . . . . [t]o get [her] terminated." *Id.* at 46,-47, 66-67. Rowe later again went outside of Gateway, and met with Sue Guy, the Human Resources Director for Wayne County, and Wayne County Manager Lee Smith about what she saw as Branch's inability to do the job. *Id.* at 56-57.

Branch emailed Rowe on December 29, 2010 to schedule a meeting with her at 1:00 p.m. that

5

day.  Aff. of Guy, Ex. N [DE-41-1] at 52-53.  Rowe asked Director Stubbs to attend the meeting with

her as a witness, but he declined, saying he had to let Operations Manager Branch do his job.  Dep

of Rowe [DE-40-2] at 38-39.  Rowe then told Branch that she could not meet with him that day, and

she rescheduled the meeting for the next day.  *Id.*  When she met with Branch the following day, she

brought Sylvia Barnes, President of the Wayne County NAACP.  According to Rowe, the Chairman

of Gateway's Board of Directors, Donnie Chatman, told her it was fine for her to bring Barnes to the

meeting with Branch. *Id.* at 57-58.

According to Gateway, Branch called the meeting with Rowe to discuss her poor job

performance and derogatory comments towards coworkers.  Aff. of Guy [DE-41-1] ¶ 56.  Rowe

testified, however, that Branch spoke about her "character" at the meeting, and that he complained

about that she kept her door closed and went outside Gateway to talk to the DSS supervisor about

her concerns.  Dep. of Rowe [DE-40-2] at 40, 62-66.  When Branch spoke to her about billing issues,

Rowe redirected the conversation to what she perceived to be scheduling problems, which angered

Branch.  *Id.* at 62-63.  Barnes, who ostensibly was only to be there as a witness, then changed the

subject and brought up complaints the NAACP had received about Gateway. *Id.* at 69-70, 73, 74.

Subsequent to the meeting, Branch composed a written warning to Rowe for unprofessional

conduct and poor job performance.  The written warning stated, in pertinent part:

> On 30 Dec 2010 at 1300 hrs, you approached me concerning the meeting and when
> I informed you that Alan Stubbs wasn't available to meet at the appointed time, you
> insisted the meeting still take place. Once I agreed to proceed with the discussion,
> you introduced me to a lday and informed me that she would be attending the
> meeting as your witness. Once inside my office, you introduced her as an elected
> official on [sic] the NAACP. The conversations quickly moved to your perceptions
> of GATEWAY and the alleged violations that have transpired within the last year.
> You [sic] accompanied guest quickly threaded [sic] NAACP actions to go "Public"
> via television and radio that GATEWAY has failed to address or acknowledge the

> "civil violations and illegal workplace practices by the NAACP.["] After several failed attempts to redirect the conversation to the meetings [sic] intended purpose, I firmly pointed out the inadequacies and job performance you demonstrate on a daily basis. You failed to acknowledge my attempts to resolve/address the negative behavior you exhibit in the work place, but continued to point out the actions and behavior of the past manager, prejudicial behavior Alan Stubbs demonstrates toward his subordinates, and the favoritism he displays towards a select few associates. Mary Rowe, your behavior and deceitful actions will no longer be tolerated in addition [sic], your deliberate inclusion of the NAACP into a minor job related performance matter are [sic] shameful. At no point during the meeting did you acknowledge your own personal behavior and accountability, but you rebuffed my every attempt to come to resolution or to establish a meaningful plan to correct your behavior. Your attempts to include the NAACP, into a minor performance issue, have damages your creditability [sic] and I hear that your values HIGHLY conflict with our organizational goes and objectives. If your performance doesn't immediately improve, I'll immediately levy progressive disciplinary actions upon you.

Aff. of Guy, Ex. O [DE-41-1-] at 54-56. The warning states that a copy was personally delivered to Rowe; however, it is unsigned by her. *Id.* at 56. Rowe maintains that she never saw the warning until she was later allowed to go through her personnel file. Dep. of Mary Rowe [DE-40-2] at 75.

Soon after her meeting with Branch, Director Alan Stubbs sent a memo to Rowe requesting the status on all the billing by January 10, 2011. *Id.* at 86. Aff. of Guy, Ex. E [DE-41-1] at 28-29.

On January 12, 2011, Operations Manager Branch emailed Rowe, stating the following:

> Mary,
>
> Considering all the concerns we are having with agencies and our billing problems, please start including Alan and I on e-mail traffic, on your responses to agencies/ and discuss content prior to sending out communication.

Aff. of Guy, Ex. G [DE-41-1] at 35-36. In her deposition testimony, Rowe maintained that the mistakes being attributed to her were the fault of scheduling staff, but she did say that she did not get all information to the required parties in a timely manner; she attributed to this to the fact that she did not have time to get it done. Dep. of Mary Rowe [DE-40-2] at 84-86.

On January 13, 2011, Branch received an email from Cheryl Hallock at East Carolina University, a Gateway client, regarding billing concerns. Aff. of Guy, Ex. F [DE-41-1] at 34. She followed up with another email on January 14, 2011, detailing her concerns with incorrect invoices, and her unsuccessful attempts to resolve them with Rowe. *Id* at 33. Also on January 13, 2011, Branched received an email from Bonnie Clark, the DSS employee, regarding her views on billing concerns that "need to be corrected ASAP." *Id.* at 31-32.

Accordingly, in or about mid-January 2011, Branch drafted another written warning to Rowe:

Your job performance and productivity have been found to be unsatisfactory for the reason set forth below. Since your appointment as billing clerk, you have failed to demonstrate the knowledge skills and abilities set forth in your job description. External and internal customer complaints are increasing and you have failed to complete assigned tasked [sic], billing corrections and properly communicate with customers. To date, you have failed to demonstrate any commitment or willingness to establish short term corrective action goals, bring billing errors current or acknowledge any accountability associated with your position. Please review the accompanying documentation, from agencies that have communicated with you over the past few months but have yet to receive the requested data/follow up (in order to insure [sic] prompt payment). My communication to you has consistently yielded two standards replies "I wasn't trained on billing until December" and "Those errors/issues were done before I was placed in billing." At no point have you communicated your willingness to correct past problems associated with billing, nor do you communicate internally any problems associated with you job. Over the past month, outside agencies have complained about the quality and timeliness of your work, our company has lost money (profit) due to your oversights and our organizations [sic] image has suffered an embarrassing setback, all directly attributed to repeated billing errors/lack of follow up. I seriously question if you have the proper work ethic, willingness, and basic knowledge skills and abilities needed to perform the functions associated with your currently assigned position. Moving forward, I will consult with the [sic] Alan Stubbs and discuss the following option(s): Your immediate removal from billing, imposing a 30 day probationary period for you to demonstrate significant improvement, outline a performance improvement plan and set reasonable guidelines for you to complete the billing errors communicated to me from external agencies. Needless to say, change must occur within the billing position, your work ethic and especially your professional conduct.

Aff. of Guy, Ex. H [DE-41-1] at 37-39. Again, the warning stated it had been personally delivered to Rowe, but like the previous warning, it was unsigned. *Id.* at 39. Again, Rowe maintains she was never shown the written warnings by Branch.

Besides difficulties in timely meeting her job obligations, Rowe seemingly was involved in some personal strife at Gateway. Specifically, an Administrative Assistant Eva Pest emailed Branch on January 14, 2011, recounting a confrontation she had with Rowe and Jeri Teachey. According to Pest's email, Rowe told Pest that morning that people were talking about Pest's husband cheating on her. Aff. of Guy [DE-41-1], Ex. B at 21. Pest later obtained her paycheck from Jeri Teachey, and Rowe was present at the front desk. Teachey insinuated that Pest was engaged in adultery. The email resulted in a meeting being held by Sue Guy, the then-Human Resources Director for Wayne County, with Rowe, Teachey, Pest, Stubbs and the County Manager to resolve the situation. Dep. of Mary Rowe [DE-40-2] at 97-98. Rowe contends that she did not spread rumors about Pest, and instead it was another employee, Angie Waddell, who started the rumors. *Id.* 101-02. When asked in her deposition why she didn't say at the meeting that what was being spread were things Pest had confided in Waddell, Rowe answered: "Why would I–I mean, if I kept it that long why would I expose it at the meeting? I mean, I didn't see a reason to talk about her husband. I don't know her. I mean, I didn't know her husband." *Id.* 102.

In late January or early February 2011, Alan Stubbs resigned as Director and Jennings "Trey" Rhodes was brought in to fill the position. *Id.* at 30. After Rhodes took over as Director, Rowe was transferred her to the position of receptionist. *Id.* at 106. According to Gateway, Rowe was transferred to the receptionist position because of her past performance issues in the billing clerk position. Aff. of Guy [DE-41-1] ¶ 41.

9

Rowe testified that during the summer of 2011, she found out that Rhodes was talking about her behind her back to other employees, and she noticed him talking to *her* about other employees. Dep. of Mary Rowe [DE-40-2] at 108-09. Rowe heard that Rhodes had said he was going to get rid of her. *Id.* at 109. Rowe eventually went to Sue Guy to raise her concerns about Gateway, including her opinion that Rhodes was two-faced. *Id.* at 116-17.

Additionally, at some point after Rhodes became Director of Gateway, Rowe heard rumors that he had sexually harassed women when he worked at Wayne County Emergency Medical Services ("EMS"). *Id.* at 146-51. Rowe wanted know the truth for herself, so she approached Rhodes in his office and asked him whether he had done so. *Id.* at 196. Rhodes said it wasn't him, and when Rowe asked him who was the person responsible, Rhodes responded that it was someone named John. *Id.* at 152, 196. Rowe could see that Rhodes was offended by her question. *Id.* at 187.

Rowe contends that in August 2011, Tamra Renfrow, the Human Resources Administrator for Gateway, told her about an incident where Rhodes put his hand beneath her sweater, but over her shirt. *Id.* at 170. Renfrow told Rowe that two other employees were present when the incident occurred. *Id.* Rowe then called Donnie Chatman, the Chair of Gateway's Board of Directors, about Renfrow's claim, and Chatman told Rowe that Renfrow would have to file a compliant. *Id.* at 181. Renfrow declined to do so. *Id.* at 181.

Rowe also contends that in September 2011, a Gateway driver, Kim Coley, told her that she had seen Rhodes with his hands "all over" another Gateway employee, Krystal Waters. *Id.* at 176. Rowe did not take any action on Coley's story at that time.

On October 6, 2011, Terry Jordan, who replaced Michael Branch as Operations Manager, issued an oral warning to Rowe for communicating in an unprofessional manner with drivers over

the radio, and for her failure to inform a driver that he did not need to pick up a passenger. Aff. of Terry Jordan [DE-42-1] ¶ 11; Ex. A; Dep. of Mary Rowe [DE-40-2] at 114-15. Rowe refused to sign the paper, saying she did not do anything wrong. *Id.* at 115, 119. Rowe claims Jordan was creating a paper trail to set her up to be fired. *Id.* at 120-21. Rowe wrote a letter to Rhodes appealing the oral warning; Rhodes did not rescind the warning. She then met with Rhodes and Jordan. At this meeting, Rhodes told her had learned of her calling him two-faced to Guy. *Id.* at 143-44. Rowe then wrote Rhodes another letter, again expressing disagreement with the oral warning and expressing her desire to appeal the warning to Gateway's Board of Directors. *Id.* at 130-32. She also wanted to talk to the Board about the contents of her personnel file with which she disagreed. *Id.* at 133-34. Chatman told Rowe that she needed to submit any appeal request to the Director, Rhodes, if she had not already done so. Aff. of Donnie Chatman [DE-41-2] ¶ 7.

Also in October 2011, another Gateway employee, Adrienne Deloatch, told Rowe that Rhodes was sexually harassing her. *Id.* at 156. At the time, Deloatch and Rowe attended the same church, and Rowe told Deloatch to pray that Rhodes would keep his hands off of her. *Id.* Rowe then called Nettie Green, who she testified was her spiritual mother, and asked her to pray for Deloatch. *Id.* at 157. That same day, Rowe also called the President of the NAACP, Barnes—who also is an ordained minister—and asked her to pray for Deloatch. *Id.* at 166. Rowe waited a couple of weeks, and then called Chatman, and told him that female employees were being harassed by Rhodes. *Id.* at 181-84. According to Rowe, Chatman again said that the employees would have to make a written complaint. *Id.* at 184.

The parties' stories diverge as to what happened next. In Chatman's affidavit, he states that after speaking with Rowe about the alleged harassment, he contacted Sue Guy, because she was

Human Resources Director for Wayne County, and as Director of Gateway, Rhodes was an employee of the county. Aff. of Chatman [DE-41-2] ¶ 9. Chatman then learned Guy was already aware of the allegations, because Rhodes himself had contacted her about the allegations. *Id.*; Aff. of Guy [DE-41-1] ¶ 5. That day, Rhodes had been informed by Renfrow—the HR Administrator for Gateway—that Rowe was spreading rumors that he was harassing Gateway employees. Aff. of Rhodes [DE-42-2] ¶¶ 13-14 ; Aff. of Renfrow [DE-42-3] ¶¶ 19-21. Renfrow claims she learned of the rumors from a former Gateway employee, Angela Waddell. Aff. of Renfrow [DE-42-3] ¶ 19. Rhodes asked Guy if there could be an investigation into the sexual harassment allegations so his name could be cleared. Aff. of Rhodes [DE-42-2] ¶ 16. He denied the allegations, and Guy told Rhodes to have the female employees who were allegedly harassed come to her office. *Id.* Rhodes then brought Renfrow, Waters and Deloatch to Guy's office. Aff. of Guy [DE-41-1] ¶ 7.

Rowe, however, notes that previous statements by Gateway employees conflict with this version of events. Specifically, Rowe notes that statements from Guy in the course of the EEOC's investigation of her charge, as well as notes that Guy gave to the Equal Employment Opportunity Commission ("EEOC"), indicate that Chatman informed Rhodes of the allegations against him, which was what prompted Rhodes to call Guy to request an investigation. *See* Notes of EEOC On-Site Visit [DE-43] at 72 ("I was contacted on November 8, 2011 by Trey Rhodes and told that he had been contacted [sic] Don Chatman regarding a complaint that he had sexually harassed several gateway employees."); Guy's Notes to File [DE-43] at 75 ("Trey Rhodes called to tell me that Mary Rowe had contacted Don Chatman (Gateway Board Chair) to report that he (Trey) had sexually harassed several Gateway employees. I agreed to talk with Mr. Chatman to determine the need for an investigation.").

In any event, after they arrived at her office, Guy spoke to the three women, who all appeared to be incensed by the allegations. *Id.* ¶¶ 10-11; Aff. of Renfrow [DE-42-3] ¶ 23. Each of the women denied the allegations, and wrote and signed statements indicating that the allegations were false. Aff. of Guy [DE-41-1] ¶ 12 and Ex. A; Aff. of Renfrow [DE-42-2] ¶ 24 and Ex. A. After the three women left her office, Guy then spoke to Chatman, who asked her to conduct an investigation. Aff. of Guy [DE-41-1] ¶ 14. Guy then decided she would speak to each of the three women again in order to satisfy herself that the women were comfortable in talking to her, and she attempted to identify additional individuals who could provide information about the allegations. *Id.*

Each of the women again denied the allegations and reported being angry about them. *Id.* ¶ 15. Guy then interviewed Rowe on November 9, 2011. According to Guy, Rowe was "fidgety and not making eye contact" during her interview. *Id.* ¶ 18. Guy explained to Rowe that the county takes sexual harassment very seriously and if the allegations were found to be true, Rhodes would be terminated. Although Rowe said she did not want to get involved, she did make a written statement. *Id.* ¶¶ 19-20. Rowe told Guy she had shared the allegations with Chatman, Barnes, and William Barbour, the state NAACP Chairman. *Id.* ¶ 21. Guy then reminded Rowe that she had involved people in the community who were not in a position to help, unlike Guy who was in a position to help and investigate. Rowe responded that she had told Barnes, Green and Barbour because she wanted them to pray for Deloatch. *Id.* ¶¶ 22-24.

During her interview with Guy, Rowe said that she was told by Renfrow that Rhodes had groped her under her sweater. She also reported Deloatch informing her she was scare of Rhodes, and that he called her into his office each morning and touched her breasts and between her legs. *Id.* ¶¶ 25-27. Guy then "deliberately and methodically asked . . . if there were any other issues" and

Rowe said there were none. *Id.* ¶ 28. This raised a red flag to Guy, because she had been informed by Chatman that Rowe reported that a third woman, Kim Coley, was also harassed. *Id.* ¶ 29. Guy felt that Rowe was giving her and Chatman different stories. *Id.*

Guy also interviewed Sheila Stafford, a bookkeeper whose desk was near Rhodes' office. *Id.* ¶ 30. Stafford reported that Rhodes did not call people into his office often, and she had not noticed Deloatch being called into Rhodes' office regularly. *Id.* ¶¶ 31-32. Guy reviewed security camera footage, and could find no indication that Rhodes was behind closed doors with any of the employees in his office. *Id.* ¶ 58. Guy came to the conclusion that Rowe's statement had no credibility, and that Rowe's conduct was "spiteful, motivated by vicious purposes, and was malicious and intentionally harmful to Mr. Rhodes." *Id.* ¶¶ 60-61.

At the conclusion of her investigation, Guy met with Chatman and Terry Jordan. Guy recommended that Rowe be terminated. *Id.* ¶ 62. Jordan and Chatman agreed with her recommendation because "all of the credible evidence indicated that Mary Rowe was spreading malicious lies." Aff. of Jordan [DE-42-1] ¶ 23; Aff. of Chatman [DE-41-2] ¶ 10. Although Rhodes has stated that he had no part in the decision, statements from Jordan and Chatman indicate that some of the decision-makers at least had discussions with him. Terry Jordan wrote the termination letter and delivered it to Rowe on November 9, 2011. Aff. of Jordan [DE-42-1] ¶ 24. The letter stated:

> Ms. Rowe has been instructed on previous occasions that if there are concerns regarding GATEWAY maters [sic] that need to be addressed she should go through the proper chain of command. However, Ms. Rowe has continued to go outside this structure and involve individuals outside of the organization whom should not be involved in such personnel matters. As a result of the unsubstantiated allegations' [sic] that have been made regarding Gateway Director Trey Rhodes made by Ms. Mary Roew it has been determined that it is in the best interest of GATEWAY and

14

its employees that Mrs. Rowe be terminated from employment immediately.

Aff. of Jordan [DE-42-1] Ex. B at 14.

Rowe thereafter filed a charge with the EEOC alleging she was discriminated against on the basis of her sex and religion, and that she was retaliated against when she was terminated. Compl., Attach. 3 [DE-4-3]. The EEOC made the determination that Gateway "was aware of [Rowe's] complaints to the NAACP and, on November 9, 2011, discharged [Rowe] for complaining to an outside party that [Gateway's] Director was sexually harassing female employees." Compl., Attach. 2 [DE-4-2] at 1. The EEOC determine that "the evidence supports [Rowe's] claim that she was discharged in retaliation for complaining of sexual harassment in violation of Title VII." *Id.*

Rowe then initiated this action.

### III. STANDARD OF REVIEW

Summary judgment is appropriate when no genuine issues of material fact exist and the moving party is entitled to judgment as a matter of law. *See Anderson v. Liberty Lobby*, 477 U.S. 242, 247 (1986). The party seeking summary judgment bears the burden initially of coming forward and demonstrating the absence of a genuine issue of material fact. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). When making the summary judgment determination, the facts and all reasonable inferences must be viewed in the light most favorable to the non-movant. *Liberty Lobby*, 477 U.S. at 255. Once the moving party has met its burden, the non-moving party then must come forward and demonstrate that such a fact issue does indeed exist. *See Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986). Such facts must be presented in the form of exhibits and sworn affidavits. *Celotex Corp.,* 477 U.S. at 324. Failure by a plaintiff to rebut a defendant's motion with such evidence on his behalf will result in summary judgment when

15

appropriate. "[T]he plain language of Rule 56(c) mandates the entry of summary judgment . . . . against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Id.* at 322.

## IV. DISCUSSION

Gateway initially interpreted Rowe's Complaint as alleging that she was (1) discharged in retaliation for complaining of sexual harassment; (2) discriminated against on the basis of her religion; and (3) discriminated against on the basis of her sex, all in violation of Title VII. Gateway has moved for summary judgment on all three claims. Rowe has clarified in her responses that she is not asserting a claim for sex discrimination, and accordingly, only the first two claims need be discussed by this court.

### A.     Retaliation

Title VII provides:

> It shall be an unlawful employment practice for an employer to discriminate against any of his employees . . . because he has opposed any practice made an unlawful employment practice by this subchapter or because he has made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing under this subchapter.

42 U.S.C. § 2000e-3(a). A plaintiff may establish a Title VII retaliation claim under the burden-shifting framework set forth in *McDonnell Douglas*. *See Foster v. Univ. of Md.-Eastern Shore*, ___ F.3d ___, 2015 WL 2405266, at *5 (4th Cir. May 21, 2015). First, a plaintiff bears the burden of establishing a prima facie case of retaliation, whereupon the burden shifts to the employer to establish a legitimate, non-retaliatory reason for the adverse action. If the employer sets forth a legitimate, non-retaliatory reason for the action, the plaintiff then bears the burden of showing the

employer's proffered reasons are pretextual or her claim will fail. *Price v. Thompson*, 380 F.3d 209, 212 (4th Cir. 2004). Thus, "[i]f a plaintiff can show that she was fired under suspicious circumstances and that her employer lied about its reasons for firing her, the factfinder may infer that the employer's undisclosed retaliatory animus was the actual cause of her termination." *Foster*, 2015 WL 2405266, at *4.

To establish a prima facie case of retaliation, a plaintiff must show that (1) she engaged in a protected activity; (2) her employer took an adverse action against her; and (3) a causal connection exists between the protected activity and the asserted adverse action. *King v. Rumsfeld*, 328 F.3d 145, 151-52 (2003). With regard to the first element of the prima facie case, the Fourth Circuit has explained that "[p]rotected activities [under Title VII] fall into two distinct categories: participation or opposition." *Laughlin v. Metro. Wash. Airports Authority*, 149 F.3d 253, 259 (4th Cir. 1998). "The distinction between participation clause protection and opposition clause protection is significant because . . . . the scope of protection for activity falling under the participation clause is broader than for activity falling under the opposition clause." *Id.* at 259 n.4 (quotation and citations omitted). Under Title VII, participation activities include making a charge, testifying, assisting or participating in an investigation, proceeding, or hearing under Title VII. *Id.* at 259. Here, there was no EEOC charge or investigation pending at the time Rowe engaged in any of her conduct, so it cannot be said that she engaged in participation activity. *See id.*; *see also Gethers v. Harrison*, 27 F. Supp. 3d 644, 653 (E.D.N.C. 2014) ("Participation activity refers to activity in formal Title VII proceedings, such as presenting a formal charge, testifying, assisting or participating in a formal investigation.").

17

Thus, Rowe must proffer evidence that she was engaged in opposition activity. "Opposition activity includes internal complaints about alleged discriminatory activities." *Session v. Montgomery County Sch. Bd.*, 462 F. App'x 323, 325 (4th Cir. 2012) (unpublished) (per curiam) (citing *EEOC v. Navy Fed. Credit Union*, 424 F.3d 397, 405-06 (4th Cir. 2005)). Opposition activity is protected when an employee opposes an "actual unlawful employment practice" or "an employment practice that the employee *reasonably believes* is unlawful." *Jordan v. Alternative Res. Corp.*, 458 F.3d 332, 338 (4th Cir. 2006). The issue of "whether an employee reasonably believes a practice is unlawful is an objective one" and "may be resolved as a matter of law." *Id.* In determining what constitutes opposition activity, a court must "balance the purpose of the Act to protect persons engaging reasonably in activities opposing . . . discrimination, against Congress' equally manifest desire not to tie the hands of employers in the objective . . . control of personnel." *Id.* (internal citation and quotation omitted).

Gateway offers two arguments why Rowe has failed to show she engaged in protected opposition activity. First, it argues that Rowe could not reasonably believe that she was opposing Rhodes' alleged sexual harassment where she did not witness first-hand any of the conduct, and did not verify the second-hand information she received regarding Krystal Waters. In Gateway's view, Rowe's allegations are "defeated by the allegedly harassed employee's denials." Mem. in Support of Mot. for Summ. J. [DE-38] at 21. The court, however, cannot agree with this assertion. It appears to the court that there is at least a genuine issue of material fact as to whether Rowe had a reasonable, good faith belief she was opposing sexual harassment. If Rowe's testimony is believed, the jury could find that she contacted the Chair of the Board of Directors of Gateway, Chatman, at least one time raising concerns that female employees were being harassed. To be sure, Gateway has raised

18

serious questions regarding the timing of the call to Chatman and Rowe's motivation in making the phone call. Rowe's motivation, however, is something a trier of fact must decide.

Gateway's second argument regarding protected activity is that Rowe's communications to her ministers are not protected activity. The court agrees with this assertion. *Compare Drake & Minn. Mining & Mgf. Co.*, 134 F.3d 878, 886 (7th Cir. 1998) (stating that providing spiritual guidance and friendship does not constitute engaging in a protected activity). Rowe is adamant that her alerting her ministers—one of whom was the President of the local chapter of the NAACP—was purely to seek prayer for the women allegedly affected by sexual harassment. It cannot be said, then that she was "voicing [her] opinions in order to bring attention to [Gateway's] discriminatory activities." *Laughlin*, 149 F.3d at 259. Gateway seemingly overlooks, however, that Rowe also voiced at least one, if not two, complaints to Chatman regarding the alleged sexual harassment of a female employee by Rhodes. This informal complaint to Chatman undoubtedly could qualify as protected activity.

Gateway offers no other argument as to why Rowe has not established a prima facie case. The court itself finds that Rowe has offered sufficient evidence showing that (1) she engaged in protected activity, i.e., she complained to Chatman; (2) she suffered an adverse employment action, i.e., she was terminated; and (3) there is a causal connection between the protected activity and the adverse action, i.e., the temporal proximity between her complaint to Chatman and her termination. *Foster*, ___ F.3d at ____, 2015 WL 2405266, at *6. Thus, the burden shifts to Gateway to proffer a legitimate, non-discriminatory reason for terminating Rowe's employment.

This Gateway has done; it has stated that it terminated Rowe's employment because Chatman, Jordan, and Guy were convinced that Rowe was telling malicious lies and spreading those

lies inside and outside the office . *See E.E.O.C. v. Total Sys. Servs., Inc.*, 221 F.3d 1171, 1176 (11th Cir. 2000) (concluding that defendant had offered a legitimate, nondiscriminatory reason for terminating employment where defendant had concluded that employee had lied in an internal investigation). Accordingly, Rowe's claim will survive summary judgment only if she can create a genuine issue of material fact that Gateway's stated reason for her termination was pretextual.

In so doing, she must proffer evidence that creates a genuine issue of material fact as to whether the decision-makers at Gateway honestly believed she was lying. This is because it is the perception of the decisionmaker that is relevant, and it does not matter if Gateway was correct in assessment of Rowe's dishonesty, it only needs to be the sincere reason for her termination. *See Hawkins v. PepsiCo, Inc.*, 203 F.3d 274, 279 (4th Cir. 2000) ("[I]t is not our province to decide whether the reason was wise, fair, or even correct, ultimately, so long as it truly was the reason for the plaintiff's termination." (quotation omitted)). The court concludes that Rowe has failed to proffer sufficient evidence to meet this burden.

To show pretext, Rowe focuses on what she says are inconsistencies in the various statements of Guy, Chatman, and Jordan, and on what she argues are the inadequacies in Guy's investigation. Specifically, she notes that statements from Guy in the course of the EEOC's investigation of her charge, as well as notes that Guy gave to the EEOC, indicate that Chatman informed Rhodes of the allegations against him, which was what prompted Rhodes to call Guy to request an investigation. *See* Notes of EEOC On-Site Visit [DE-43] at 72 ("I was contacted on November 8, 2011 by Trey Rhodes and told that he had been contacted [sic] Don Chatman regarding a complaint that he had sexually harassed several gateway employees."); Guy's Notes to File [DE-43] at 75 ("Trey Rhodes called to tell me that Mary Rowe had contacted Don Chatman (Gateway Board Chair) to report that

he (Trey) had sexually harassed several Gateway employees. I agreed to talk with Mr. Chatman to determine the need for an investigation."). Rowe notes that this in conflict with several Gateway employees' statements in this litigation that Renfrow's report to Rhodes is what prompted his contacting Guy. *See* Aff. of Guy [DE-41-1] ¶ 6; Aff. of Rhodes [DE-42-2] ¶¶ 13-14; Aff. of Renfrow [DE-42-3] ¶¶ 20-21. She also highlights that when asked by an EEOC investigator about who made the decision to terminate her employment, Jordan allegedly answered: "It was a combination of the Board Chard [sic] Chairman, Don Chatman, Sue Guy's investigation and her findings and Mr. Rhodes [sic] and myself's discussion." Notes of EEOC On-Site Visit [DE-43] at 107.

Whatever these inconsistencies may reveal, what has remained consistent from the decision-making witnesses' accounts is that all of them believed Rowe was spreading malicious lies. *See* Aff. of Guy [DE-41-1] ¶ 66 ("Mary Rowe was terminated for maliciously reporting false allegations."); Aff. of Chatman [DE-41-2] ¶ 10 ("I agreed with Sue Guy's recommendation that Mary Rowe be terminated based on this unacceptable personal conduct of spreading malicious lies."); Aff. of Jordan [DE-42-1] ¶ 23 ("All of the credible evidence indicated that Mary Rowe was spreading malicious lies."); Notes of EEOC On-Site Visit [DE-43] at 74 (Guy telling investigator that her input with regard to Rowe's discharge was "[t]hat she did maliciously make this up and spread it around and she did not follow the procedure in reporting. . . . She went outside of the policy and didn't handle it through the proper channels and it was malicious and unfounded."); Guy's Notes to File [DE-43] at 79 ("It appears Mary fabricated these stories and spread them inappropriately in an effort to cause harm to Trey Rhodes. . . . It is my opinion that Mary did this maliciously with intent to harm Trey Rhodes and Gateway and her employment should be terminated."); Notice of EEOC On-Site Visit [DE-43] at 110 (Jordan telling EEOC investigator that Rowe's termination "had everything to do

21

with that it caused among the employees and it being a false allegation and even though it was determined to be a false allegation she continued to spread this information"). Their conclusion was buttressed by all three of the alleged victims denying Rowe's allegations that (1) Rhodes had harassed them and /or (2) that they had told Rowe about such alleged harassment. *See* Aff. of Guy, Ex. A [DE-41-1] at 17-19. Indeed, one of the women, Adrienne Deloatch, said in her written statement to Guy: "Mary Rowe on several occasions has stated that she would do what she had to do to get Trey & Terry out of Gateway. I know that these sexual harassment charges are bogus and are lies." *Id.* at 17. Although Rowe has since procured a notarized letter from Deloatch stating that she was in fact harassed by Rhodes and did in fact confide to Rowe about it, Deloatch's letter also states that she "denied everything" to Guy. Deloatch Letter [DE-45] at 6. Deloatch also states that when she later testified at an Employment Security Commission meeting she lied under oath when she denied Rowe's claims. *Id.* at 7. Unfortunately for Rowe, Deloach's letter serves to bolster Gateway's defense, in that it supports the idea that Guy, Chatman, and Jordan had a good faith belief that Rowe was lying. Moreover, to the extent that Rowe attacks the investigation itself, the court finds that her attacks fail to create a genuine issue of material fact as to pretext. *See Estate of Bassatt v. Sch. Dist. No. 1 in the City & Cnty. of Denver*, 775 F.3d 1233, 1241 (10th Cir. 2014) ("The proper inquiry is not whether the inadequacy of the investigation foreclosed [the decision-maker] from the possibility of believing [the plaintiff]. Rather, the relevant inquiry is whether [the decision-maker] subjectively, but honestly, believed that [the plaintiff] had engaged in the misconduct."). Again, the undisputed facts show that each of the women Rowe alleged had been harassed denied the allegations in no uncertain terms, and expressed anger at the allegations. That Guy did not interview

22

every employee of Gateway in the course of her investigation is not sufficient to create an issue regarding pretext.

Accordingly, Gateway's motion for summary judgment is ALLOWED as to Rowe's claim for retaliation.

## B. Religious Discrimination

Rowe also asserts a religious discrimination claim under Title VII. Under that statute, an employer may not discharge or discriminate against an individual in employment because of the individual's religion. 42 U.S.C. § 2000e-2(a)(1). As the Fourth Circuit has recognized, an employee may bring both a disparate treatment claim and a reasonable accommodation claim based on religious discrimination under Title VII. *Chalmers v. Tulon Co. of Richmond*, 101 F.3d 1012, 1017 (4th Cir. 1996).

### 1. Disparate Treatment

Much like other discrimination claims, plaintiffs seeking to prove they were subjected to disparate treatment on the basis of their religion may utilize direct evidence or the evidence burden-shifting scheme set forth in *McDonnell Douglas. See Adams v. Trustees of the University of N.C.-Wilmington*, 640 F.3d 550, 558 (4th Cir. 2011). In the context of religious discrimination, a plaintiff establishes a prima facie case by (1) showing she was part of a protected group; (2) showing she was performing her job satisfactorily; and (3) providing "'indirect evidence whose cumulative probative force supports a reasonable inference that [the] [adverse employment action] as discriminatory.'" *Chalmers*, 101 F.3d at 1017 (quoting *Lawrence v. Mars, Inc.*, 995 F.2d 902, 905-06 (4th Cir. 1992)). Indirect evidence "might consist of evidence that the employer treated the employee more harshly

than other employees of a different religion, or no religion, who had engaged in similar conduct." *Id.*

Here, Rowe has not established a prima facie case of religious discrimination. Specifically, the record does not contain evidence establishing the third element of the prima facie case, i.e., evidence giving rise to an inference of religious discrimination. Rowe has not shown that she was treated any differently from any other employee of a different religion or no religion. *DeJarnette*, 133 F.3d at 298. Nor has she offered any other type of evidence that gives rise to an inference of religious discrimination. In the absence of such evidence, Rowe cannot establish a prima facie case of religious discrimination. Moreover, even if she could, for the reasons stated in connection with the retaliation claim, the court finds that Gateway proffered a legitimate, non-discriminatory reason, and Rowe has failed to proffer sufficient evidence of pretext.

2.       Failure to Accommodate

"To establish a prima facie religious accommodation claim, a plaintiff must establish that: (1) he or she has a bona fide religious belief that conflicts with an employment requirement; (2) he or she informed the employer of this belief; and (3) he or she was disciplined for failure to comply with the conflicting employment requirement." *Chalmers*, 101 F.3d at 1019.

Rowe's filings, broadly construed, can be read as stating that her bona fide religious beliefs caused her to pray about her co-workers allegations of sexual harassment, and reach out to others in request for prayer about the allegations. The record is also clear that Rowe was fired, in part, for Gateway's belief that she spread false rumors outside the organization—i.e., she contacted Nettie Green and Sylvia Barnes in request for prayer regarding the allegations. This presumably could satisfy the first and third elements of a prima facie case.

24

Nevertheless, Rowe has failed to show the second element of a prima facie case: that she informed Gateway of this belief that required her to reach out to others for prayer requests regarding her co-workers' allegations of sexual harassment. The Fourth Circuit has made clear that "a prima facie case under the accommodation theory requires evidence that [a plaintiff] informed her employer that her religious needs conflicted with an employment requirement and asked the employer to accommodate her religious needs." *Id.* This she did not do. While the record allows the inference that Gateway had knowledge that Rowe was a Christian, there is nothing in the record indicating that Gateway was on notice that Rowe's beliefs would require her to first alert her spiritual leaders about allegations of harassment in her place of employment, rather than follow her employers' requirements for reporting the allegations. Consequently, Rowe has not established a prima facie case, and Gateway is entitled to summary judgment on any religious discrimination claim.

## V. CONCLUSION

For the foregoing reasons, Defendant's Motion for Summary Judgment [DE-37] is ALLOWED, and its Motions to Strike [DE-46, DE-48] are DENIED. The Motion to Continue [DE-64] filed by Defendant is DENIED as moot. The Clerk of Court is DIRECTED to unseal the letter at Docket Entry 45, and close this case.

SO ORDERED, this the _11_ day of June, 2015.

James C. Fox

JAMES C. FOX
Senior United States District Judge